Elizabeth PICHLER, et al.

v.

**UNITE (Union of Needletrades, Industrial & Textile Employees AFL–CIO).**

**Civil Action No. 04–2841.**

United States District Court, E.D. Pennsylvania.

Feb. 22, 2011.

Paul R. Rosen, David B. Picker, Spector Gadon & Rosen PC, Philadelphia, PA, for Plaintiffs.

Laurence M. Goodman, Mark Featherman, Willig Williams & Davidson, Lawrence T. Hoyle, Arleigh Pritchard Helfer, Hoyle Fickler Herschel & Mathes, LLP, Thomas Herman Kohn, Markowitz & Richman, Philadelphia, PA, for Defendants.

## MEMORANDUM

DALZELL, District Judge.

This Memorandum will consider the resolution of this class action that has reposed on this Court's docket since June 28, 2004. As it risks understatement to mention that the background of this case has been extensively rehearsed [1], we will only briefly describe it here in order to put into relief

---

**1.** *Pichler v. UNITE*, 339 F.Supp.2d 665 (E.D.Pa.2004) (holding the action not a labor dispute exempt from the DPPA) (*"Pichler I"*); 228 F.R.D. 230 (E.D.Pa.2005) (certifying class action against UNITE) (*"Pichler II"*); 446

class counsel's motion for approval of the settlement and for an award of attorneys' fees and expenses.

This action alleged UNITE's violation of the privacy of public motor vehicle records of various employees of Cintas Corporation in the Allentown, Pennsylvania area. The named plaintiffs and then-putative class representatives claimed that UNITE and the International Brotherhood of Teamsters ("IBT") violated the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, *et seq.*, when UNITE[2] organizers obtained the plaintiffs' names and addresses from official motor vehicle records as part of UNITE's nationwide campaign to unionize Cintas.

After extensive discovery and motion practice, we certified a class which, pursuant to the settlement, both sides now agree numbers as many as 1,209 members. After disposing of the liability issues involving the class representatives, we entered judgment in most of their favor for $2,500 each and resolved other related issues as to them only. *See Pichler III and IV.*

Both sides cross-appealed to the Court of Appeals, which ultimately affirmed our imposition of liability and entry of separate awards to two class representatives and the dismissal of two others. *Pichler v. UNITE,* 542 F.3d 380 (3d Cir.2008). The Court of Appeals vacated and remanded for further proceedings our refusal to award punitive damages or grant multiple awards of liquidated damages. Notably, the Court of Appeals did not address questions relating to classwide relief.

The United States Supreme Court denied UNITE's petition for a writ of *certiorari* on March 23, 2009, *UNITE v. Pichler,* —— U.S. ——, 129 S.Ct. 1662, 173 L.Ed.2d 995 (2009). On remand after the Supreme Court's denial of review, UNITE moved for summary judgment on the punitive damages issue, which the class opposed. In *Pichler VI* we granted UNITE's motion and denied the class the right to seek punitive damages. Whereupon, we entered judgment on August 12, 2009 for the remaining class representatives in the amount of $2,500 each and enjoined UNITE from using their motor vehicle information.[3]

After it became apparent from the plaintiffs' submissions that they disagreed over many issues regarding class-wide relief and other class-related matters, with their agreement we referred the matter to the Hon. Jacob P. Hart for mediation. After protracted mediation that included three sessions before Judge Hart, the parties finally agreed to a Settlement Agreement that we preliminarily approved in our Order of October 15, 2010. Notices were mailed first class to the 1,209 members that the parties agreed were potential members of the class entitled to submit proofs of claim. We convened a final fairness hearing on February 18, 2011.

F.Supp.2d 353 (E.D.Pa.2006) (granting summary judgment as to liability against UNITE only and entering judgment of $2,500 per violation of certain named plaintiffs) (*"Pichler III"*); 457 F.Supp.2d 524 (E.D.Pa.2006) (amended final judgment) (*"Pichler IV"*); 238 F.R.D. 405 (E.D.Pa.2006) (unsealing much of the record) (*"Pichler V"*); and 646 F.Supp.2d 759 (E.D.Pa.2009) (denying punitive damages, entering $2,500 judgment for nine remaining named plaintiffs, and enjoining UNITE from using their motor vehicle information) (*"Pichler VI"*).

2. UNITE is an acronym for the Union of Needletrades, Industrial & Textile Employees AFL–CIO. After this action was filed, UNITE joined with another union to form UNITE HERE. The settling party is actually "UNITE HERE" as successor to defendant "UNITE", but for ease of reference and consistency we will throughout this Memorandum refer to the defendant and settling party as "UNITE".

3. By this time plaintiffs had settled and dismissed their claims against the IBT and Bruce Raynor. Thus, UNITE remained the only defendant in the class action.

*The Settlement Agreement*

After almost a year of negotiations under the patient and creative supervision of Judge Hart[4], the parties on September 30, 2010 at last executed the Settlement Agreement. Briefly summarized, the Settlement Agreement adopted this Court's December 14, 2005 class definition in *Pichler II* which included:

> All persons whose personal information from motor vehicle records was knowingly obtained, used and/or disclosed, directly or indirectly, by UNITE or UNITE HERE between July 1, 2002 and October 13, 2004 to attempt to contact Cintas Corporation employees.

Sett. Agr. at ¶ 2.5. The Agreement also obliged UNITE to deposit $4,022,500 into an escrow account to pay claimants and to fund the $1 million in attorneys' fees and costs to be paid to class counsel if we approved that sum.

As noted, the Settlement Agreement identified 1,209 potential class members with known addresses. It also provided that each eligible class member should receive the statutorily liquidated damages of $2,500 to which we found such class members should be entitled, rather than actual damages (a statutorily significant distinction, *see* 18 U.S.C. § 2724(b)(1)). To the extent that fewer than 1,209 potential claim members become eligible claimants, any balance remaining in the escrow account would be returned to UNITE.

On October 15, 2010, we entered an Order granting preliminary approval of the settlement. This Order gave objectors until January 4, 2011 to file any objections to the Settlement Agreement, and set the fairness hearing that we in fact convened (as ordered) on February 18, 2011. The Order also imposed a deadline of April 8, 2011 for potential class members to send in completed Claim Forms in order to determine whether they were indeed eligible to receive the $2,500.

As of the hearing, no one had objected to any term of the Settlement Agreement or to the agreed-upon award of attorneys' fees and costs.

*Fairness Analysis*

■ Since 1975 the leading case in this Circuit for determining the fairness, reasonableness and adequacy of class action settlements is *Girsh v. Jepson*, 521 F.2d 153 (3d Cir.1975). *Girsh* identified, *id.* at 157, nine factors that courts should consider in determining whether to approve class action settlements.[5] To be sure, our Court of Appeals has recently noted that the nine *Girsh* factors are not necessarily exclusive factors that courts should consider, *see In re Insurance Brokerage Antitrust Litig.*, 579 F.3d 241, 259 n. 17 (3d Cir.2009) (citation omitted). But, as will shortly become clear, the fairness, reasonableness and adequacy of this settlement is so plain that we need not consider any factors beyond those *Girsh* identified.

A. *Complexity, Expense and Duration of the Litigation*

■ This first *Girsh* factor need not detain us in view of the pendency since June of 2004 of this hotly-contested action.

---

4. Indeed, counsel for both sides agreed at the fairness hearing that Judge Hart's efforts were "invaluable and essential."

5. The nine *Girsh* factors are: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

In the recitation of the pertinent history, we listed in note 1 the six reported decisions we have made, as well as the Court of Appeals's exhaustive canvass of the many issues—almost all of first impression—that it canvassed after we entered judgment as to the named plaintiffs only. Indeed, it is fair to say that every issue of any moment that we faced in this litigation was of first impression. The DPPA landscape was so barren of landmarks that when a Court of Appeals first navigated the terrain it looked to our decision in *Pichler II* for assistance. *Kehoe v. Fidelity Federal Bank & Trust*, 421 F.3d 1209, 1213 n. 3 (11th Cir.2005) (holding, with respect to the reasoning in *Pichler II* that considered several novel issues, "we find its analysis of the issue before us well-reasoned and persuasive").

UNITE is unquestionably correct when it notes in its memorandum that "[h]ad a settlement agreement not been reached, the Court and the parties would have had to resolve the same issues addressed by the Settlement Agreement—determining how an individual demonstrates membership in the Class and hence entitlement to an award of liquidated damages, whether Class Members may recover multiple damages, and the form of any final judgment." Mem. at 8. And the history of this litigation demonstrates beyond peradventure that UNITE is also correct that any final disposition we made "would not necessarily have ended the litigation", *id.*, and that one or both sides "would likely have appealed the final judgment to the Third Circuit." *Id.* In short, absent a settlement, this almost seven year saga would age to become a latter-day *Jarndyce and Jarndyce.*

The first *Girsh* factor weighs heavily in favor of approval of this settlement.

### B. *The Reaction of the Class*

 Unlike other settlements where Courts necessarily must, at least in part, rely on publication notice, here the parties agreed on the identity of each and every potential class member. Thus, it was possible to send to 1,209 people a first-class mailing of the Notice at their last known addresses. As of the January 4, 2011 deadline, not one potential class member objected. By the time of the hearing, that number remained at zero.[6]

The second *Girsh* factor strongly favors approving the settlement.

### C. *The Stage of the Proceedings and Quantum of Discovery*

 This third *Girsh* factor is, as our Court of Appeals later noted, designed "to ensure that a proposed settlement is the product of informed negotiations . . . ." *In re Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283, 319 (3d Cir.1998). Again, UNITE understates the reality when it observes that it "is difficult to conceive of a matter in which the parties are more informed about the underlying facts and law." Mem. at 9. There were, for example, depositions of forty individuals as well as review of thousands of pages of documents. As UNITE adds, "[t]he litigation of this matter, both in this Court and the Third Circuit, has, in large part, established the law in this jurisdiction regarding DPPA liability." *Id.; see Pichler v. UNITE*, 542 F.3d at 383 (3d Cir.2008) ("This case presents several issues of first impression in this court of appeals regarding application of the Driver's Privacy Protection Act of 1994."). As noted above, the Eleventh Circuit in *Kehoe, supra,* also found our reasoning "persuasive". Not-at-all-parenthetically, *Kehoe* reversed a dis-

---

**6.** To be sure, class counsel reported at the hearing that some mailings have been reported as undeliverable, but this only constitutes mundane evidence (if any more were needed) that we will never live in a perfect world.

trict court decision to the contrary of *Pichler II*.

Under these circumstances, there is no doubt that the parties are intimately familiar with the facts and law at issue. It is also, as UNITE points out, "beyond dispute that the Settlement resulted from arms-length negotiations between Class Counsel and UNITE's counsel." Mem. at 10. By the time the parties proffered the settlement to us, this matter had reposed on our docket for over six years. The remaining issues—and they were many and, as noted, worthy of *Bleak House*[7]—still had to be decided. After three protracted settlement conferences under the supervision of Judge Hart—himself a demonstrated master of mediation—the matter at last was resolved.

This third *Girsh* factor unquestionably supports the approval of this settlement.

### D. *Litigation Risks and Maintaining the Class Action*

■ Although the Settlement Agreement provides for the payment of the full $2,500 per eligible class member—one hundred percent of the liquidated damages we held were applicable—and although the Court of Appeals affirmed our decision as to the named plaintiffs, the question as to liability of the class action was, as UNITE notes, dependent on the viability of our decision in *Pichler VI* granting summary judgment to UNITE on the putative damages question. Indeed, from the beginning of this case, our holding that only statutory damages of $2,500 were available was the linchpin of our holding on class

action certification. *See Pichler II* at n. 48. While we harbor little doubt on our decision regarding putative damages, our Court of Appeals could well have taken another view, which alone could have been fatal to the maintenance of this litigation as a class action.

It is therefore clear that class members would be unlikely to benefit from further litigation, and indeed the handsome result obtained in the Settlement Agreement would be put at risk had the litigation continued. The fourth, fifth and sixth *Girsh* factors together tip in favor of approval.

### E. *Ability of the Defendant to Withstand a Greater Judgment*

■ As noted in our description of the Settlement Agreement, UNITE is paying each class member the full amount we awarded to the named plaintiffs. And against the contingencies of further litigation and the risks entailed with it, UNITE has in fact paid the full amount at issue into escrow.

This seventh factor is therefore of no moment to our *Girsh* calculus.

### F. *Range of Reasonableness*

■ These *Girsh* factors (eight and nine), too, are readily disposed of. Under the proposed Settlement Agreement, each eligible class member will receive one hundred percent of what we awarded to the named plaintiffs. This result alone puts this case in stark contrast to every other class action over which we have presided, where claimants typically received only a

---

7. For example, assume class representatives Thomas and Amy Riley, who are married registered co-owners of a car, received two visits from a UNITE organizer made possible by finding the Rileys' car registration in the Pennsylvania Department of Motor Vehicles. Do Thomas and Amy *each* get $2,500? Should they get $2,500 for *each* visit by the organizer because each visit constitutes a different "use" under 18 U.S.C. § 2724(a)? It would take little time for the fertile imaginations of lawyers to multiply this exemplar into dozens of occasions for pettifogging that would justly place this case beside *Jarndyce and Jarndyce* "which was squeezed dry years upon years ago." Charles Dickens, *Bleak House* 7 (Norton Critical Ed.1977).

small percentage of their possible recovery if the matter had proceeded to judgment. And it bears repeating that class members' one hundred percent recovery is *not* subject to reduction for counsel fees, which UNITE will pay separately.

Since UNITE has already deposited the funds into the escrow account, each of the 1,209 individuals on the list of potential class members will, if eligible, promptly receive the $2,500 payment to which we held they are entitled. Such an outcome defines reasonableness.

■ Taken together, there is no doubt under *Girsh* that the settlement is fair, reasonable and adequate. We will therefore approve it.

*Attorneys' Fees and Expenses*

■ Class counsel's motion for an award of attorneys' fees and costs in the exact amount of one million dollars need not long detain us.

It is important to note here that class counsel was originally retained by Cintas Corporation, a national employer with over $3.5 billion in sales in fiscal year 2010. Cintas is publicly-traded on NASDAQ. As of the close of trading on February 17, 2011, Cintas had a market capitalization of $4,260,227,460 (145,301,073 outstanding common shares at a closing price of $29.32).

Cintas describes itself in its Report on SEC Form 10–K (the "10–K") as the employer (as of May 31, 2010) of "approximately 30,000 employees of which approximately 225 were represented by labor unions". 10–K at 4. Thus, on the face of its 10–K, in one short sentence Cintas describes itself as being essentially union-free. *See also* note 8, below. Its market capitalization and number of employees also make clear that it is a major business enterprise.

Class counsel advises in its motion for the award of fees and expenses that through December 31, 2010 it "has charged Cintas a total of $1,442,449.82 in fees and $127,227.78 in out-of-pocket disbursements." Mem. of Law in Supp. of Pls.' Mot. for Award of Atty. Fees for Pls.' Class's Counsel ("Atty. Fee Mem.") at 7. After the writeoff of $10,846.22, Cintas was billed $1,548,826.30. Class counsel represents that "Cintas has paid nearly all of this amount" *id.*, and has done so on a monthly basis throughout the course of this litigation.

Thus, we are here in the unusual position of having a lodestar that has no hypothetical aspect to it. Cintas, a highly-sophisticated purchaser of legal services, has regularly paid for these services and the incurring of these expenses for over six and a half years. The award class counsel seeks here is only 64.6% of this real-world lodestar amount. Measured against an outcome where eligible class members receive one hundred percent of what we held they were entitled, this discount of the lodestar is generous and the sum to be paid is (relatively) modest.

And measured against a litigation where each side regarded its opponent as the White Whale,[8] there is no need to belabor

---

8. As to the parties' regard for each other as Ahab and the White Whale, a flavor of this perception may be found in Cintas's description of itself on page 6 of its 10–K:

Cintas continues to be the target of a corporate unionization campaign by several unions. These unions are attempting to pressure Cintas into surrendering our employees' rights to a government-supervised election by unilaterally accepting union

representation. We continue to vigorously oppose this campaign and defend our employees' rights to a government-supervised election.

But it bears stress that in contrast to the epic antagonism of the parties, class counsel and UNITE's counsel throughout this litigation have conducted themselves with high standards of professionalism. To be sure, every inch of ground was hard-fought, but we salute

the usual analysis undertaken under the fee-shifting authority of *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) or its progeny in this Circuit. In the class action context, we are mindful of the need to look at the lodestar as our Court of Appeals instructed in, *e.g., In Re Prudential*, 148 F.3d at 336–40.

It is important to stress that, unlike cases such as *In re Rite Aid Sec. Litig.*, 396 F.3d 294 (3d Cir.2005), this is not a common fund case. As canvassed at length, the class recovery will in no way be diminished by class counsel's receipt of attorneys' fees and expenses. Thus, it is a matter of indifference to any class member what UNITE has agreed to pay class counsel.

But since the lodestar here is uniquely "hard" because a sophisticated third party has in fact paid it over more than six years, and because the sought fee and expense constitute less than two-thirds of the lodestar, there can be no question as to its reasonableness. We will therefore approve the agreed-upon one million dollar payment to class counsel.

### ORDER

AND NOW, this 22nd day of February, 2011, upon consideration of plaintiffs' motion for final approval of settlement of certified class action and entry of final judgment (docket no. 311), and motion for award of attorneys' fees for plaintiffs' class counsel (docket no. 310) and the memorandum submitted in support thereof (*see also* docket no. 312), and after a hearing on February 18, 2011 at which no putative class member appeared or objected to the Settlement Agreement, and the Court finding that notice has been given to all potential Class Members by first class mail and thereby satisfies Fed.R.Civ.P. 23(e)(1), 28 U.S.C. § 1715(b) and due process, and

that the settlement and proposed award of attorneys' fees and costs is fair, reasonable and adequate for the reasons canvassed in the accompanying Memorandum, it is hereby ORDERED that:

1. The motions are GRANTED;

2. The Settlement Agreement is APPROVED as fair, reasonable and adequate pursuant to Fed.R.Crim.P. 23 and the parties are DIRECTED to consummate the Settlement Agreement in accordance with its terms;

3. Upon entry of this Order and Judgment the Class Members are BOUND by the terms and exclusive remedies for all claims as provided in the Settlement Agreement;

4. This action is DISMISSED WITH PREJUDICE subject to the reservation of this Court's jurisdiction set forth below;

5. All Class Members are deemed to have released and forever discharged (as by an instrument under seal without further act by any person, and upon good and sufficient consideration), on behalf of themselves and their agents, heirs, executors and administrators, successors, insurers, attorneys, representatives, and assigns, each of UNITE, UNITE HERE, and Workers United and any affiliated corporations, predecessors, successors, subsidiaries, and purchasers, and their insurers, attorneys, employees, agents, representatives, officers, directors, managers, members, assigns, heirs, personal representatives and all other persons, firms or corporations with whom any of the former have been, are now, or may hereafter be acquired and/or affiliated (the "Releasees"), of and from any and all past, present or future legal and equitable claims, demands, obligations, actions, causes of action, damages, costs, liabilities, expenses and compensation of any kind or nature

class counsel and UNITE's for the exemplary level of their advocacy.

whatsoever, known or unknown, asserted or not asserted, accrued or not yet accrued, arising from or relating to UNITE's alleged obtainment, use and/or disclosure of the Class Members' motor vehicle information during the period July 1, 2002 through October 13, 2004 which were or could have been brought in this action; *provided, however,* that such Release will not release the Releasees from any obligations they have assumed pursuant to this Settlement Agreement;

6. No Class Member shall recover, directly or indirectly, any sums for claims released by operation of the Settlement Agreement from Releasees, other than sums received under the Settlement Agreement, and Releasees shall have no obligation to make any payments to any non-parties for liability arising out of claims released by operation of the Settlement Agreement;

7. In any action brought by a Class Member against any non-party arising out of or related to any claims in this action, should any non-party sued by a Class Member file a claim or cause of action against any Releasee for contribution or indemnification, however denominated, arising out of or related to the claims in this action, Class Members shall be deemed to have agreed to reduce or remit any judgment against the non-party by the percentage, amount or share necessary under applicable law to fully discharge and relieve Releasees of liability to the nonparty for claims for contribution and indemnification, however denominated;

8. The provisions of the Settlement Agreement and any claim thereunder constitute a good faith Settlement under California Code Civil Procedure §§ 877 and 877.6 and comparable laws in other states and named plaintiffs, Class Counsel and Class Members shall cooperate fully in any effort of Releasees to establish such good faith settlement before any court (including, without limitation, by joining in any motion or other procedure and providing declarations and other evidence to establish such good faith settlement where requested by any Releasee) and that all payments made under the Settlement Agreement relate to claims arising out of, or related to, this action;

9. If any non-party sued by a Class Member obtains a judgment against any Releasee for contribution or indemnification, however denominated, arising out of or related to the underlying facts of this action, Class Members shall reduce or remit their judgment against the non-party by the amount of the non-party's judgment against the Releasee not to exceed the amount of that portion of the judgment for which the non-party obtains contribution or indemnification, however denominated, so as to fully satisfy the non-party's judgment against the Releasee;

10. In the event that any Class Member seeks to invoke California Civil Code § 1542—which provides that "a general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the relate, which if known to him must have materially affected his settlement with the debtor"—or any other like provision of law in connection with the claims in this action, the Class Members and each of them are deemed to have expressly waived the provision of California Civil Code § 1542 (and all other like provisions of law) to the full extent that these provisions may be applicable to this Release. Each of the Class Members is deemed to have assumed the risk that facts additional, different, or contrary to the facts, which each believes or understands to exist, may now exist or may be discovered after this Settlement Agreement becomes effective and each of the Class Members is deemed to have agreed that any such additional, dif-

ferent, or contrary facts shall in no way limit, waive, or reduce the foregoing release, which shall remain in full force and effect;

11. All Class Members are hereby ENJOINED from filing, commencing, prosecuting, maintaining, intervening in, participating in (as class members or otherwise), or receiving any benefits from any other lawsuit, arbitration, or administrative, regulatory, or other proceeding or order in any jurisdiction based on or relating to the claims in this action, or the facts and circumstances relating thereto; in addition, all persons are hereby ENJOINED from filing, commencing, prosecuting, or maintaining any other lawsuit as a class action on behalf of Class Members, if such class action is based on or relates to the claims in this action, or the facts and circumstances relating hereto. The Court FINDS that the issuance of this injunction is necessary and appropriate in aid of the Court's jurisdiction over this action, and no bond is necessary for issuance of this injunction;

12. UNITE is deemed to have released and forever discharged (as by an instrument under seal without further act by any person, and upon good and sufficient consideration), the named plaintiffs, the former plaintiffs, Class Counsel, and Class Counsel's law firm Spector Gadon & Rosen, P.C. and all of its current and former partners, associates, attorneys and employees from any and all past, present or further legal and equitable claims, demands, obligations, actions, causes of action, damages, costs, liabilities, expenses and compensation of any kind or nature whatsoever, known or unknown, asserted or not asserted, accrued or not yet accrued, arising from this prosecution of this action;

13. Class Counsel's request for fees and expenses in the amount of One Million Dollars is APPROVED and UNITE shall REMIT this award to Class Counsel from the escrowed Settlement Funds within thirty days of the Settlement Effective Date;

14. This Court shall RETAIN jurisdiction of this matter in order to resolve any dispute that may arise in the implementation of the Settlement Agreement or the implementation of this Order and Judgment;

15. The Honorable Jacob P. Hart, United States Magistrate Judge is hereby AUTHORIZED and APPOINTED to serve as Independent Claims Administrator in accordance with § 8.13 of the Settlement Agreement and Judge Hart shall, as provided in the Settlement Agreement, resolve any issue regarding whether a Claimant is an Eligible Claimant with the meaning of the Settlement Agreement in the event that Class Counsel and UNITE's counsel disagree about such eligibility;

16. UNITE and its officers, employees and agents are hereby PERMANENTLY ENJOINED from using or disclosing any personal information of the Class Members that UNITE obtained in violation of the Driver's Privacy Protection Act, 28 U.S.C. §§ 2721–2725;

17. Neither the Settlement Agreement nor the Settlement approved therein, nor any act performed or document executed pursuant to or in furtherance of the Settlement Agreement or the Settlement (i) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any released claim, or any wrongdoing or liability of any Releasee, or (ii) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any Released Party in any civil, criminal, or administrative proceeding in any court, administrative agency, or other tribunal. UNITE may file the Settlement Agreement or this Order and Judgment in any other action that may be

brought against it related to the claims in this action in order to support a defense or counterclaim based on principles of *res judicata,* collateral estoppel, release, good-faith settlement, judgment bar or reduction, or any theory of claim or issue preclusion or similar defense or counterclaim;

16. In the event that the Settlement Agreement does not become effective, is terminated, or is disapproved by any appellate court, then this Order and Judgment shall be rendered null and void, and in such event, all orders entered and releases delivered in connection therewith shall be null and void; and

19. The Clerk of Court shall CLOSE this case statistically.